THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FRANCISCO GIRONA, Defendant and Appellant.

No. 7975.   Argued December 20, 1940.—Decided July 26, 1941.

*M. Benítez Flores, M. Cruz Horta* and *V. Rivera Colón* for appellant. *George A. Malcolm, Attorney General, R. A. Gómez, Prosecuting Attorney,* and *Luis Negrón Fernández, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE TRAVIESO delivered the opinion of the court.

The District Attorney of San Juan filed an information against Francisco C. Girona, appellant herein, charging him with libel consisting in the publication in May 1937, of a book entitled *"Las Fechorías del Bandolero Trujillo"* (Misdeeds of Bandit Trujillo), which was circulated in the city of San Juan and tended to attack the honesty, integrity, virtue, and reputation of Mr. Rafael Leónidas Trujillo Molina, at that time President of the Dominican Republic. The alleged defamatory imputations appear in the information described as follows:

"A. Graphic page unnumbered (marked '1' by the district attorney for the purpose of this information). It is a print representing a man dressed as a convict, with the following legend at the foot thereof: 'Rafael Valdés Trujillo, Felon President of the Dominican Republic, a ravisher, the chief of a gang of highwaymen, dressed as a convict, during the years when his criminal misdeeds were such that no penal sanction could be found in the Dominican statutes that might not have been applied to this bloodthirsty hyena.' B. Graphic page unnumbered (marked '3' by the district attorney for the purpose of this information.) It is the photograph of the corpse of a person which presents wounds, with the following legend at the foot thereof: 'A government resting on force must have recourse to traitorous and cowardly assassination. The brave Dominicans who raised their angry protests againt the claims of Chapita met a sure and cowardly death at the hand of gangs organized for such purpose by the Dominican hyena.' C. Graphic page unnumbered (marked '7' by the district attorney for the purpose of

this information). A drawing representing a human being tied to the tail of a running horse which drags him behind, with the following legend at the foot thereof: 'This is one of the punishments inflicted by Chapita to those who disagree with his administration; tied to the tail of a wild horse to be dragged over stony plains until the victim dies, losing at every place a piece of his body. Justice from a petty tyrant . . . . .' D. Graphic page unnumbered (marked '8' by the district attorney for the purpose of this information). It contains a drawing showing the naked body of a woman lying down, with the following legend at the foot of the page: 'One of the sadic amusements of Chapita and his henchmen: the ravishing of distinguished Dominican ladies. And what is most painful is that complete immunity protects the insolent swashbuckler who commits the rape, and his victim can not cry out her disgrace under penalty of being cowardly killed.' E. Graphic page unnumbered (marked '15' by the district attorney for the purpose of this information). A picture representing a human being hanging by the feet and with his hands tied and a uniformed man who pulls him downward. There is on the margin a photograph of President Trujillo, at the base of which appear the words 'God and Trujillo,' with the following legend at the foot of the page: 'In the name of "God and Trujillo" there are committed in the Dominican country the foulest murders. This photo shows the punishment inflicted on a wealthy Dominican whose estates were confiscated by Chapita.' F. On a printed page unnumbered (marked '17' for the purpose of this information) the following words appear: 'Trujillo, a born thief.' G. A printed page (marked '13' by the author of the book), wherein it is stated: 'In Mata de Palma, district of Seybó, Chapita ravished the daughter of Secundino Japa. In Ceibita, belonging to Central Quisqueya, he captured with the help of two other officers three girls, and in the presence of their father, who had been first tied up, they were raped.' H. On a printed page (marked '15' by the author) the following is published: 'In 1911, Rafael Leónidas Trujillo, while employed in the State Postal and Telephone Service stole state funds from the Postal and Telephone office of San Cristóbal.

"In 1912 Trujillo was again prosecuted and jailed, together with his brother Virgilio, for stealing animals; in Zorras, Buenas Colonias, Central Angelina, he was arrested and wounded by a policeman for stealing horses. In 1918 Trujillo counterfeited the signature of one Mr. Bernardino whose employee he was.' I. On a printed page

(marked '16' by the author), it is stated: 'In Paso del Medio, a rural district of San Pedro de Macorís he ravished a daughter of one Mr. Jiménez, an uncle of Raúl Mieses, and stole from him in his own house eight hundred dollars in cash.' J. A printed page (marked '21' by the author), wherein the following legend appears: "Down with Trujillo, a cattle thief."

After a trial and conviction by the Municipal Court of San Juan, the defendant took an appeal to the district court where he was tried *de novo*, convicted, and sentenced to pay a fine of $100 and, in default of such payment, to be confined in jail. Feeling aggrieved by that judgment, the defendant took the present appeal.

Fifty errors have been assigned by the appellant as committed by the trial court. The first two relate to preliminary questions raised by the defendant prior to the commencement of the trial. The remaining forty-eight refer to rulings of the trial court refusing to admit evidence submitted by the defendant and ordering the striking out of part of the testimony given by witnesses for the defendant. We will only consider those assignments which in our judgment raise substantial questions that might affect the rights of the defendant.

Sections 245 and 246 of the Penal Code now in force read as follows:

"Section 245.—*Injurious Publication Presumed Malicious.*—An injurious publication is presumed to have been malicious *if no justifiable motive for making it is shown.* (Italics ours.)

"Section 246.—*Truth a Defense, When.*—In all criminal prosecutions for libel, the truth may be given in evidence to the court or jury, and if it appears to the court or jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted. The jury have the right to determine the law and the fact."

The oral evidence submitted by the defendant tended to establish the two defenses permissible under the two sections above quoted, that is, that he had justifiable grounds for

publishing the book, and that the facts as published by him were true.

In the fourth assignment it is alleged that the court erred in striking from the record the answer given by the witness, Dr. Leovigildo Cuello to a question propounded by the court itself. The stricken answer reads as follows: "I can assure the court that under the administration of Trujillo more outrages and crimes have been committed than those related in this book."

Dr. Cuello, a Dominican, a physician-surgeon who graduated from the University of Paris testified in regard to the murder in San José de las Matas, Santo Domingo, of Mr. Virgilio Martínez Reina and his wife, by a band, under the express orders of Trujillo; that among the assailants there were persons who hold important positions in the Government, the Army, and the Police of Santo Domingo. To a question from the court as to whether such facts were known to him personally, he answered:

"Well, with the leave of the court, one must take into account the abnormal situation in Santo Domingo and that as regards any statements that I might make in connection with that crime I could not produce any conclusive direct evidence regarding the men who participated in that criminal act. However, I can positively assure the court that they met at Santiago de los Caballeros Fortress and proceeded, under the command of an Army lieutenant towards San José de las Matas, and they met at the residence of the then Senator Torres, . . . ."

He further testified that he was not present at the meeting but that he saw the wounded and examined the dead body of Virgilio Martínez Reina; that it presented 68 dagger, knife, and bullet wounds and one inflicted with a machete that almost severed his head; that the wife died upon reaching his clinic and that she exhibited three mortal wounds; that two days before they were murdered, the Martínez-Reina spouses, who were staying in his clinic, left the same on being informed that there was a plot to kill them, and that

Martínez Reina in order not to implicate him decided to go to San José de las Matas, to recover from a recent severe attack of appendicitis; that the person who warned them of the conspiracy was General Desiderio Arias, "also deceased." The court sustained the objection of the district attorney, saying: "the best evidence would be the testimony of the person who gave you such information."

Dr. Cuello further testified than when Mrs. Martínez Reina arrived at the clinic she was very slightly conscious and prayed heaven to forgive her murderers, and that she did while being carried to the operating room; that in Santo Domingo no murder is committed in that way unless it is done by order of . . . (the witness was unable to proceed because the district attorney objected and the court sustained the objection). To a question from the defendant whether the occurrence had been investigated, the witness answered: "Murders ordered by Trujillo are never investigated"; whereupon the court ordered the answer to be stricken out on the ground that it was a conclusion of the witness. The witness went on to testify: that he had read the book published by Girona. The incident which has given rise to the fourth assignment, according to the record was as follows:

"Q. We are going to put the question in another way. Can you assure the court whether the events which have taken place in the Dominican Republic during the administration of President Trujillo are faithfully related in this book or whether they have been exaggerated in any way?

"District Atty.: I object because the witness has related the facts as known to him. The witness can hardly state whether or not that is true, unless it be upon the basis of the personal opinion of the witness.

"Judge: The court will sustain the objection because the question is put in general terms. The court has not before it all the facts that have taken place in Santo Domingo. The contention here is that there is involved a prosecution for libel based on imputations made by the defendant in a book, and that is what he wants to

show, that they are true, in order to justify his intention and overcome the presumption of malice.

"Atty. Benítez Flores: This book has been introduced in evidence by the district attorney and what we ask now is whether or not such facts are true.

"Judge: If the witness has personal knowledge of the facts, let him answer; but if his answer is based on information from other people such answer must be stricken out.

"A. I can assure the court that under the administration of Trujillo more outrages and more crimes have been committed than those related in this book.

"Dist. Atty.: I move to strike that out.

"Judge: Let that be stricken out. Objection sustained.

"Q. Doctor, from your knowledge of this book and from your personal knowledge of the Dominican Republic during President Trujillo's administration, are the facts as related in this book true or not?

"Dist. Atty.: He has already answered that.

"Judge: Let him answer. The court wishes to explain that it is within the power of the district attorney to cross-examine and that he can have all hearsay evidence stricken out.

"A. Not from my personal knowledge, but I want to state that everything that has come to my knowledge as regards crimes, political murders, and outrages and which I consider to be known by everybody, has actually happened.

"District Attorney: You do not know it of your own knowledge?

"Judge: As the witness himself has stated that he knows the facts from hearsay because everybody knows them and that he has no personal knowledge of them, the court orders that they be stricken from the record.

"Atty. Benítez Flores: I take exception."

Lastly, Dr. Cuello testified that he remained in Santo Domingo about a month subsequent to the murder of the spouses Martínez Reina; that he did not undertake to ascertain the facts, because he was afraid the same thing might happen to him; that he did not concern himself in finding out what steps had been taken by the Government, because they knew it was the Government and "because the family knew that they had been murdered by Trujillo"; that no one was prosecuted. The court, on motion of the district attorney, or-

dered the striking out of the reference to Trujillo and also, as immaterial, of that part of the testimony of the witness relating to the fact that no one had been prosecuted on account of the double murder.

Dr. Juan Isidro Jiménez Grullón substantially testified as follows:

That he was acquainted with Daniel Ariza who died in the Nigua Prison; that that is one of the many prisons where the Trujillo administration confines all political prisoners; that Ariza died in his presence, "the victim of blows inflicted with the butt of the rifle of a guard"; that he and the other political prisoners were locked in small cells, 3 by 3½ meters, known as "*solitarias*", and without any clothes on; that on the day of Ariza's death they had been weeding grass and as their guards had been instructed not to let them even breath, every time that they felt tired the guards would threaten them with their bayonets; that there is no doubt that Ariza's death was caused by the blows inflicted on him by the guard with his rifle's butt. The following incident appears from the record:

"District Attorney: I am really gratified to here the witness, a distinguished personality, but the places referred to by the witness are not among those mentioned in the information, and the matter is immaterial.

"Judge: What is sought to be stricken out by the district attorney is the manner of his death and how he was treated there, on the ground that that is immaterial and irrelevant and in the opinion of the court it is irrelevant. . . If the matter regarding which the witness is testifying has no connection with the facts charged in the information, the same should be stricken out. He had already mentioned the treatment received by him. Anything else is immaterial. The matter is stricken out. Please proceed."

The witness further testified that he was present when some of his companions were carried away to be shot, walking them in front of his cell to take them to "Camaguí," which was the place that was to become a sort of graveyard;

that in that way he saw the shooting of Vitalino Pimentel and of an Argentine young man; that he was struck by the fact that the administration did not confine itself to the Dominicans but also to Puerto Ricans, like Colón Piris; and that later on he verified the shooting of an Austrian subject. The district attorney moved to strike out the testimony of the witness. We will transcribe from the record.

"District Attorney: I move that the testimony of the witness be stricken out.

"Judge: Motion is granted as to that part referred to by him as being a graveyard and that those people were shot there and that he verified it.

"District Attorney: And also the matter regarding the Argentine and Pimentel.

"Witness: I saw them passing by.

"Judge: The fact of the shooting, did you infer it from the fact that he passed by?

"A. Yes, Sir.

"Q. Is that an inference?

"A. Yes, Sir. There in Nigua it is customary prior to a shooting to fetch the shovels and picks from cell Number 6 which was where I was confined. That afternoon they took out the shovels and picks to dig the grave and that same night we heard the volley and next day we got confirmation of the fact from the very guard who shot him. I have no official record.

"Judge: That is why the court orders all that hearsay evidence to be stricken out. The court thinks that really all are more or less inferences made by the witness. The court does not mean to say that there is no foundation, but the court entertains no doubt that he is only speaking on information received by him, and therefore it thinks that the matter is hearsay evidence and orders the same to be stricken out.

"'Attorney Benítez Flores: We take exception."

Dr. Jiménez Grullón went on to testify thus: That he did not see the dead body of Pimentel after the shooting; but he did not see him again alive in the Nigua Prison; that prior to the shooting he used to see him very often, each time they whipped him out of his cell, almost daily; that after he

was taken out of his cell and he heard the volley and the guards told him that they had shot him he did not see Pimentel again; that he saw the whipping of numerous prisoners in the Nigua Prison, especially Dr. Ramón de Lara, Félix María Ceballos, Daniel Ariza, Maduro Piña, and many more that he can not name because they are still in that country and his testimony might injure them; that the whippings were carried out more or less as shown in Mr. Girona's engraving; that the instruments used for whipping the prisoners were of two kinds, a cowhide (*vergajo de toro*) and a knotted electric wire which was called *"canta claro"* (*sing clear*), because it was used to compel the prisoners to make true or false statements; that each time that an investigation was commenced the prisoners were first whipped and then brought before the Military Commission; that he witnessed such whippings; that Félix María Ceballos had on his back the scars from such whippings; that another young man by the name of Sánchez was "pathetically whipped" and was brought into the cell of the witness, with his shoulders disfigured from the whipping inflicted on him.

On motion of the district attorney, the lower court ruled to strike out all that part of the testimony of Dr. Jiménez Grullón about the whippings and tortures inflicted upon the prisoners as irrelevant on the ground that the same had been carried out "by people other than the person defamed as charged in the information." We quote further from the record:

"Atty. Benítez Flores: If the court please, everything contained in this book does not refer to acts committed by Trujillo personally but by his agents and under his administration, under his Government.

"Judge: It is already clearly stated in the information: in connection with the book published and where he has been defamed, and then the specification of the facts. All reference to such whippings is stricken out from the testimony of the witness. According to the information itself and on page 7 of the book where the punish-

ment which the person defamed used to inflict is set forth; as this is a direct charge against Mr. Trujillo, all other acts committed by his officers are not committed by him. The court rules to strike out the testimony as immaterial and irrelevant.

· "Atty. Benítez Flores: We take exception."

The witness further testified that he witnessed the confinement of Dr. Lara in the "*solitaria*" and when he was whipped; that they kept him for 50 days in the "*solitaria*", almost naked. The striking out of that testimony was ordered over the objection of the defendant. Counsel for the defendant moved for a reconsideration on the ground that on page 93 of Girona's book there appears a whole chapter which refers to the "Via Crucis of Dr. Lara," and that as Dr. Grullón had witnessed such "Via Crucis," his testimony was required to show the truth of those facts. The motion was denied and the proper exception was taken.

The witness testified that he knew Dr. Eduardo Vicioso, who was his companion in the Nigua Prison. The district attorney objected and the court sustained his objection. Counsel for the defendant took exception and stated that Dr. Jiménez Grullón had witnessed the whippings and tortures inflicted on Dr. Vicioso, and that his testimony was necessary to justify the publication of such facts in the book and the absence of malice in so publishing them. The court reaffirmed the exclusion of that testimony and said:

"The court has maintained that, as such testimony has no direct reference to Mr. Trujillo, who is the person against whom the libel has been· published and the person alleged to have been defamed, such facts, if proven, would be impertinent, irrelevant, and immaterial as regards the case now before us."

Similarly the witness was not allowed to testify as to ·his knowledge regarding the imprisonment, torture, and death of the inmate León Reinosa in the "Homenaje" jail.

In a description of the life led by the prisoners in the Nigua jail, he said: That they were compelled to work from 6 a. m. to 6:30 p. m.; that while working they were not al-

lowed to wear anything; that they worked under the constant watch of a sentry who would threaten them with the butt of his rifle if they attempted to mitigate their fatigue; and that at 11:30 a. m. they would be taken to the dining room and compelled to eat with their dirty hands, soiled with the earth on which they continuously worked. The court ruled that the above be stricken out as irrelevant, and counsel for the defendant took exception.

We transcribe from the record the remainder of the testimony of Dr. Jiménez Grullón, as follows:

"Q. Do you know who is the Commanding Officer of the Army of the Dominican Republic?

"A. At present?

"Q. Yes.

"A. At present it is a brother of Dictator Trujillo, a man by the name of Bienvenido Trujillo.

"Q. And at the time you were in Nigua?

"A. At first General José García and afterwards General Federico Fiallo, a perfect hyena.

"District Attorney: I move to strike out the latter statement from the witness.

"Judge: Let the phrase 'a perfect hyena' be stricken out. And it is the request of the court that no statement of that character should be made.

"Q. Is it not true that under the Constitution the President is the Commander-in-Chief of the Army and that the others are temporary heads?

"District Attorney: This is not the evidence required by law in order to show who is the Commanding Officer of the Army.

"Judge: Objection sustained.

"Q. Are those persons mentioned by you members of the Trujillo Administration?

"A. Yes, sir.

"District Attorney: I move to strike that out.

"Judge: It will be stricken out.

"Q. And all the officers in the jails of Nigua which you have mentioned here, do they not form part of the administration of the Dominican Republic?

"A. Yes, sir.

"Q. And did they when you were there?

"A. Yes, sir.

"District Attorney: I move to strike that out, because the Administration is not in issue here.

"Judge: Objection sustained and let the statement be stricken out.

"Atty. Cruz Horta: Exception taken.

"Atty. Benítez Flores: The ground of the exception is that the district attorney alleges in the information itself, among other things, on page 1, letter 'B,' as the basis of his information for libel against Girona and as taken from the book which he introduced in evidence, the following words: 'A regimen which rests on force must resort to treacherous and cowardly murder, etc.' And if the district attorney alleges in this information as the ground for libel that an attack was published in a book against the Administration, the evidence which we seek to introduce to prove the truth of those facts is admissible. Your Honor, counsel for the defendant wish to state at this time that, in order not to interrupt the proceedings, and in view of the rulings of this court in connection with the different questions which have been put to this witness, all tending to show the absence of malice on the part of defendant Girona, because of the fact that they all tend to show the truth of the facts narrated in the book, and in order that we should not have to repeat again this examination and bring about the same ruling as before, which we consider to be adverse to the purposes sought by the defense, and, with due respect to this court, erroneous, we will proceed no further in the examination of this witness who would testify as to similar matters; and this is all with the witness.

"Judge: A recess is taken until tomorrow at 9 a.m."

The exclusions ordered and the rulings made in connection with the testimony of Dr. Jiménez Grullón constitute the basis of the assignments of error numbered from 6 to 13 inclusive.

Dr. Miguel Angel Pardo, a Dominican physician and surgeon, who practices his profession in the Municipal Hospital of San Juan, was called to testify. He was asked to state the reason why he had to leave Santo Domingo, and the district attorney objected to the question as being immaterial; whereupon the court sustained the objection, counsel for the

defendant taking an exception. He was asked: "Were you imprisoned in the Dominican Republic during the Trujillo administration?" The district attorney objected to the question as immaterial and because "nothing is alleged regarding this witness." The court, without knowing what the answer of the witness would be, made the following ruling:

"Judge: The court is of the opinion that the evidence must correspond with the pleadings. It must be directly and not remotely connected. If the facts sought to be proved by the defendant refer to the facts as charged, the court thinks that if what is sought to be established through the testimony of the witness is the truth of charges made, the fact of the witness having been imprisoned is immaterial and irrelevant. He has stated that he was in Santo Domingo during the administration. Therefore, he may testify regarding facts witnessed by him, in connection with the allegations made in the information.

"    *    *    *    *    *    *    *

"Atty. Benítez Flores: We take exception."

Finally Dr. Pardo testified, stating: That while he was confined in the Nigua Prison he saw President Trujillo "personally whipping political prisoners in my presence while I was a prisoner"; that among those whipped by Trujillo himself he remembers Attorney Ramón Valdés, Carlitos Alvarez, Dr. Raymond, Abigaíl del Monte, a former senator, and Juan Cedó; that the group included moreover Dr. De Lara, Fabio Fiallio, Gautier, and the witness, "who were not whipped." Upon the witness being asked by counsel for the defendant whether he knew in the Dominican Republic Miss Celeste Castillo, the district attorney objected on the ground that the question was immaterial. Counsel for the defendant stated that it was one of the cases of rape to which reference had been made in the information as being imputed to Trujillo. The court, without even allowing the witness to state whether or not he knew Miss Castillo, sustained the objection of the district attorney and ruled as follows:

"If the court allowed such question, the fact of the rape would be established and the court should not allow any reference to the

reputation of persons who might be prejudiced by reason of such question and the court thinks that that is not the way to prove it. The objection is sustained.''

After numerous and superfluous incidents, Dr. Pardo went on to testify: that he knew Celeste Castillo and that she is dead. The question ''Did you see her die,'' was objected to by the district attorney and excluded by the court, which said: ''But to witness her death he must have seen her dying and then the death certificate must be produced.'' The defendant took exception and the witness proceeded to testify: That he treated Miss Castillo for a self-inflicted bullet wound; that when he saw her she was in a very serious condition, near death. According to the record, the examination of the witness continued as follows:

''Q. Did she make at the time any statements relative to Trujillo?

''District Attorney: I object because it is immaterial.

''Judge: The court sustains the district attorney's objection as the evidence is immaterial and irrelevant and, furthermore, because it is a case of hearsay evidence. What might have happened to her with somebody else is not in issue.

''Atty. Cruz Horta: I am going to establish the materiality of this evidence to the court. I am going to show that Trujillo ravished this young lady at a dance and I am going to prove that by means of her dying declaration.

''District Attorney: It is inadmissible.

''Atty. Cruz Horta: That is an element to prove a rape, un-doubtedly.

''Judge: A rape is not in issue.

''Atty. Cruz Horta: I am going to prove that when she knew that she was going to die and was actually assisted by the witness, she said that Trujillo had ravished her and that that was why she had shot herself.

''District Attorney: I move to strike that out as being immaterial.

''Judge: The matter will be stricken out; as regards the statement of counsel based on what somebody else told him. He has not witnessed the fact, and what the court considers that must be

proven is the fact. If he actually saw the rape then it would be. . . . . .

"Atty. Cruz Horta: In a chain of facts tending to show the rape I am establishing a fact which precisely tends to prove the rape in question. Does the court refuse to allow any evidence on this question?

"Judge: No, the court sustains the objections when they are founded. The court can not anticipate anything.

"Q. What statements, if any, did this lady make to you in connection with Trujillo?

"District Attorney: I object.

"Judge: Objection sustained.

"Q. Did she make any statement relative to any carnal act between herself and Trujillo?

"District Attorney: The same objection.

"Judge: Objection sustained."

The witness proceeded thus: That he knew the organization generally known as "the 42"; a gang of bandits, a group organized for beating and killing if necessary in conformity with instructions from Trujillo; that he heard those instructions given while imprisoned in the Fortaleza; that he heard Trujillo call his assistant, Miguel Angel Palomena, and say to him: "Go and find so and so and bring him here, dead or alive"; that that was not the gang which killed Virgilio Martínez Reina but another one organized in Santiago de los Caballeros on instructions from Trujillo; that that is publicly known (stricken out); that José Estrella a government delegate at Cibao, was connected with the Santiago gang. The defendant sought to establish, through the testimony of Dr. Pardo, the general reputation of Señor Trujillo in Santo Domingo, the district attorney objected, and the court refused to allow anything to be said in this respect, on the ground that it was immaterial and irrelevant. The defendant took exception.

All of the assignments numbered 14 to 21 inclusive relate to the testimony of Dr. Pardo.

Attorney Guaroa Velázquez, who had been professor of law and on several occasions had served as a diplomatic representative of the Dominican Republic was called to testify. After numerous objections on the part of the district attorney, all of which were sustained by the court, the latter refused to allow the witness to testify to the fact that, under the Dominican Constitution, the President of the Republic—as in the case of every president of a republic—is the Commander-in-Chief of the National Army.

Mr. Velázquez stated: That in Santo Domingo the word *"pandilla"* (gang) means a group of armed men who meet to commit misdeeds; that he knew there the gang called "the 42," whose leader was Dr. Paulino, one Miguel Paulino whom he knew intimately; that Paulino used to obey the orders from Trujillo; that on May 18, 1930, he heard that "the 42" was in the neighborhood of his home; that he saw "the 42" and a platoon of the army commanded by Captain Vallejo and an army automobile in which Trujillo was; that the platoon entered the house and placed their rifles against their chests, and "the 42" fired shots within the house; that they seized his father, who was a candidate for the Presidency of the Republic, and took him prisoner to the Fortaleza; that that same afternoon he went accompanied by Dr. Soler, his father-in-law, to file a petition for *habeas corpus* in behalf of his father and on returning home he saw "the 42" in the hall and on the sidewalk; that Paulino, a former servant of Dr. Soler, approached the latter and told him to take his daughter away from there, because he had been ordered by Trujillo to make a raid there (the court ordered the statement from Paulino to Soler to be stricken out, as hearsay); that when he realized that the gang was near his house, he went to the corner near his house and saw inside it a platoon of soldiers commanded by Vallejo, "the 42," and Trujillo in an army car; that "the 42" drew up in front of his house and whipped, bludgeoned, or kicked anyone entering or leav-

ing the premises; that on May 17, 1930, while in the Court of Appeals, the witness saw "the 42" go into the court grounds in a threatening attitude towards the justices who were about to render their decision in the election proceedings; and that is how Trujillo won the election.

Counsel for the defendant introduced in evidence the following documents used by the defendant as his source of information for the publication of his book, having first duly identified them:

1. A copy of the issue for May 23, 1935, of the "Nation," a magazine published in New York, containing an article by Dr. Ernest Gruening, entitled "The Dictatorship in Santo Domingo, a Joint Concern."

2. A copy of the issue for January 1938, of the "American Current History," which contains an article by Mr. Carlton Beals, entitled "The Caesar of the Caribbean."

3. A copy of a report from the "Hollen Social," containing a report by Mr. Charles A. Thompson, of April 15, 1936.

4. A copy of the issue for August 25, 1938, of "Ken," a magazine which contains an article by Alfred A. Simms dealing with the administration in power in Santo Domingo.

5. A copy of "Colliers," dated January 22, 1938, with an article by Mr. Kingston Reynolds on the situation in the Dominican Republic.

6. A copy of the magazine "Los Quijotes," published in San Juan, P. R., dated July 17, 1937, containing an article by Dr. Jiménez Grullón, entitled *"La Vergüenza Dominicana en el Exilio"*; and another copy of the same magazine, dated August 31, 1937, with another article bearing the title *"La Ciencia Contra la Tiranía Trujillesca."*

7. Three articles published also in "Los Quijotes," entitled *"Roosevelt y las Tiranías," "El Presidente Trujillo Juzgado por sus Leales Subalternos,"* and *"Un Nuevo Calígula Indígeno,"* published on April 20, 1938.

Each and everyone of said documents were rejected by the court merely on the ground that the best evidence would be the testimony of the authors of the articles. Counsel for the defendant took the proper exceptions.

In order not to unnecessarily lengthen this opinion, we will refrain from making a recital of the numerous incidents, identical or similar to those already related and which took place during the introduction of the remaining evidence for the defendant.

We are not called upon to determine, within the present proceeding, whether or not the facts as published by the defendant in his book have been proved, nor to express our opinion regarding the events that might have taken place in the Dominican Republic during and under the presidency of General Trujillo.

We have before us an exceptional case. A defendant in an action for libel against the person of the head of a state who is charged with the commission of criminal acts and with having subjected his people to a dictatorial and tyrannical rule "which rests on force and must resort to treacherous and cowardly murder." In the careful search for precedents which we have made we have only found the case of *People* v. *Fornaro,* 65 Misc. (N. Y.) 457, cited by the district attorney, for libel committed against a senator of Mexico. The only point decided therein is that the crime of libel may be committed against a non-resident of the State. In the case at bar the complaint has not been filed by Señor Trujillo, nor by any of his relatives, not even by a Dominican residing in this Island that might have felt aggrieved by the offensive acts against the Executive Head of his country. As appears from the record, the complaint was filed by a resident of this country, and it does not appear that such person acted in behalf of or instructed by Señor Trujillo.

The purpose sought in punishing libel is to avoid breaches of the peace and the acts of violence that might ensue if the person defamed failed to find protection in the courts. Such dangers are not apparent when the person against whom the defamatory charges are made does not reside in the country where the publication was made. That is why neither Trujillo nor any of his relatives nor his consular agent in this island undertook to file a complaint against Girona, nor did they file it against any of the authors of the articles submitted in evidence, but not admitted by the lower court. Men who are capable by reason of their intellect or their daring to become leaders of peoples or tyrants, take shelter behind the tranquility of their conscience if they are innocent or cynically find protection behind the exemption from liability which they enjoy, if guilty. As a rule neither the innocent nor the guilty ones bring charges against their detractors.

We entertain no doubt as to the fact that the imputations contained in the complaint are libelous *per se*. The burden of the proof of malice is not upon the district attorney, as malice is presumed from the mere fact of the publication. The law, however, provides that once the fact of the publication is proven and consequently the rebuttable presumption of malice is established, such presumption may be overcome by the defendant by showing that there was sufficient ground to justify the publication and that the facts charged in the libelous publication are true. The common-law rule to the effect that the truth was inadmissible as a defense in a criminal prosecution for libel has been abrogated by federal statutes and by constitutional and statutory provisions in all the states.

In the case at bar, the defendant introduced evidence tending to show the truth of the facts published in his book and the justifiable motives he had for publishing the same. The only question which we must consider and determine is whether it was error for the court to strike out the testimony

above transcribed, and, if so, whether the error or errors committed affected the substantial rights of the defendant.

From a consideration of the evidence as a whole a substantial error arises, the source and origin of all the separate errors committed by the lower court. Closing its eyes to reality, and ignoring facts of which it could and should have taken judicial notice, the trial court proceeded to try the case as if the facts to be investigated had occurred in the midst of our insular community and not in a foreign country governed by laws dissimilar to ours and under a form of government different from ours. Neither the horrifying description of the unpunished murder of Virgilio Martínez Reina and his wife, who was soon to become a mother, made by Dr. Cuello; nor the pathetic narration by Dr. Jiménez Grullón when describing the whippings, tortures, sufferings, and execution by shooting of political prisoners in the Nigua and Homenaje Prisons; nor the description of Ariza's *via crucis,* who was killed by a brutal sentry with the butt of his rifle; nor the horrible spectacle of a human being dragged by a horse over the road, as described by an eyewitness; nor the essential fact that none of the above crimes was investigated and nobody was prosecuted or punished for the perpetration of the same, were sufficient to open the eyes of the trial judge and make him understand that the case presented one of those abnormal situations in which, liberty being eclipsed and constitutional guarantees abolished, there only prevail the will and whim of the man in power. By strictly confining itself to legal technicalities, the trial court gradually struck out one by one every testimony regarding punishments, tortures, and murders of political prisoners, committed inside jails and by government officers, on the ground that all such statements were immaterial, irrelevant, and inadmissible, and that the only admissible evidence would be the one connecting directly the Head of the Government under whom such unpunished crimes were committed, with the

guards and sentries. According to the theory of the trial court, as appears from its rulings, the only admissible evidence would have been the testimony of the subordinates, confessing the crimes and accusing their superior.

▮ The error committed by refusing to allow Dr. Pardo to testify regarding the statements made to him by Miss Castillo before she died, in connection with the rape of which she had been the victim, is manifest and prejudicial to the defendant. As appears from the testimony of Dr. Pardo, upon realizing that she was dishonored Miss Castillo took her own life by shooting herself with a revolver. The witness assisted her as a physician and tried to save her life. A short time before she died, the young victim made to her physician statements which we can not know because the lower court did not allow the witness to recite them. Said statements were inadmissible as dying declarations, which are only admissible in cases of homicide. But they were admissible, in our judgment, as part of the *res gestae,* the more so as they had been made by a declarant upon the solemn occasion of facing death.

The tactics employed by the district attorney of obstructing the defendant in his endeavors to prove his defenses, in which tactics he was sustained by the court, with rare exceptions, clearly appear from the following incidents which we transcribe from the record:

"Q. Was Mr. Trujillo filling any public office during your stay there?

"District Attorney: The best evidence would be the appointment.

"Judge: At what time?

"Attorney: At the time he was in Santo Domingo.

"Q. Can you tell whether Señor Trujillo was filling any public office at the time you were in Santo Domingo?

"District Attorney: I think that this is not the best way to show the existence of an office.

"Judge: You may answer.

"A. He was the President of the Republic.

"District Attorney: He has already testified. *All right*.
"Judge: Objection sustained."
(Transcript of Record, pp. 112 and 113.)

And we may ask: If the district attorney accepted the answer from the witness by saying "He has already testified. All right," where is the objection which the court sustained? And we will further state that counsel for the defendant was not bound to prove the fact that Señor Trujillo was the President of the Republic, inasmuch as such fact had been alleged in the complaint.

And further on:

"Q. As such President of the Republic, President Trujillo, if you know . . . . .
"District Attorney: I object.
"Judge: Objection sustained.
"Attorney: Exception taken."
(Transcript of record p. 113.)

We ask: To what and why did the district attorney object when counsel for the defense had not yet finished asking his question? Why did the court sustain an unfounded objection to a question which had not yet been asked? We could cite several similar incidents which occurred during the trial of the case. Those cited and the errors which we have heretofore discussed suffice to lead us to the conclusion that the defendant-appellant did not have the just and impartial trial to which he was entitled in accordance with the laws in force.

■ We are of opinion that in proceedings of this character, the court should give the defendant an ample and liberal opportunity to establish his defenses, softening as far as may be legally possible the rigor of the rules of evidence for the sole purpose of discovering the truth.

An affirmance of a judgment rendered under the conditions which we have described, would make possible the persecution, prosecution, and punishment of all those who, like

Ernest Gruening, Osward Garrison Willard, Carlton Beals, Charles A. Thompson, Alfred A. Simms, Kingston Reynolds, Alfred H. Sinks, and others, charged against Trujillo the same facts charged by Girona. It would likewise facilitate the prosecution and punishment of all those who in daily newspapers and in magazines and from all platforms and on the radio denounce before humanity the crimes of dictators and tyrants, as none of them could prove the truth of the acts charged by means of officials certificates or confessions from the direct authors thereof.

The judgment appealed from must be reversed and the defendant discharged.

Mr. Justice Todd, Jr., took no part in the decision of this case.